**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| ALBERT R. GARCIA, JR.,                )<br>                                                     )<br>        Plaintiff,                              )<br>                                                     )<br>    vs.                                          )<br>                                                     )<br>NEVADA BOARD OF PAROLE        )<br>COMMISSIONERS, *et al.*,                )<br>                                                     )<br>        Defendants.                          )<br>_____ ) | 3:06-cv-0118-JCM (VPC)<br><br>**REPORT AND RECOMMENDATION**<br>**OF U.S. MAGISTRATE JUDGE**<br><br>February 6, 2008 |

This Report and Recommendation is made to the Honorable James C. Mahan, United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and LR IB 1-4. Before the court is defendants D'Amico, Bashor, Williams, and Jacobs's motion for partial summary judgment (#89 and #90). Plaintiff opposed (#100) and defendants replied (#117). Plaintiff filed supplemental pleadings (#118 and #122), and defendants filed a supplemental reply (#124).[1] The court has thoroughly reviewed the record and the motions and recommends that defendants' motion for partial summary judgment (#89) be granted in part and denied in part.

## I. HISTORY & PROCEDURAL BACKGROUND

Plaintiff Albert R. Garcia, Jr. ("plaintiff"), a *pro se* prisoner, is currently incarcerated in the custody of the Nevada Department of Corrections ("NDOC") at the Northern Nevada Correctional Center ("NNCC") (#67). Plaintiff brings his second amended complaint pursuant to 42 U.S.C. § 1983, alleging violations of his First, Fifth, Eighth, and Fourteenth Amendment rights. *Id*. Plaintiff names as defendants The Nevada Board of Parole Commissioners ("Parole Board"); Dorla Salling, Parole Board Chairman; John C. Morrow, Thomas D. Goodson, Connie Bisbee, Mary Vieth, and Michael Keeler, Parole Board Commissioners; Patricia M. McGaffin and

---

[1] The court granted the parties leave to file supplemental pleadings (#120).

1 Mary Stewart, NNCC Caseworkers; The NDOC Psychological Review Panel ("Psych Panel");
2 A.T. Vogt, Psychologist; James Baca, Nevada State Prison Associate Warden; Kenneth Corzine,
3 Travis Neighbors, Edmond Mason, and Michael Thalman, NNCC Correctional Officers; Don
4 Helling, NNCC Warden; James Benedetti, NNCC Associate Warden; Danielle Iratcable, NNCC
5 Caseworker; Rod Moore, NDOC Investigator; Jeffrey Wiley, NNCC Sergeant; James Welch,
6 NNCC Lieutenant; Daniel Henson and Paul Lessard, NNCC Correctional Officers; Mary Babbs,
7 NNCC Sergeant; Sean LaGier, NNCC Correctional Officer; William Curry, NNCC Law
8 Librarian; Ted D'Amico, NDOC Medical Director; Joanne Williams, Terri Jacobs, and John
9 Brown Pegry, NNCC Nurses; Michael Bashor, NNCC Correctional Officer; Sergeant Wagner and
10 G. Moore, NNCC Sergeants; Damon Haycock, NNCC Administrative Officer; and Does 1-10.
11 *Id*.

12 Defendants' motion for partial summary judgment pertains only to count III (#89). In count III, plaintiff alleges that defendants D'Amico and Bashor violated his Eighth Amendment right against cruel and unusual punishment by failing to timely transport him to see an eye specialist in Reno, which caused him to lose sight in his right eye (#67, pp. 6-6(b)).[2] Plaintiff further alleges that defendants Williams and Jacobs violated his Eighth Amendment rights when they acted with deliberate indifference to his complaints of pain occurring after kidney dialysis treatment. *Id*. at pp. 6(b)-6(d).[3]

19 The Court notes that the plaintiff is proceeding *pro se*. "In civil rights cases where the plaintiff appears *pro se*, the court must construe the pleadings liberally and must afford plaintiff the benefit of any doubt." *Karim-Panahi v. Los Angeles Police Dep't*, 839 F.2d 621, 623 (9th Cir. 1988); *see also Haines v. Kerner*, 404 U.S. 519, 520-21 (1972).

---

[2] The court utilizes plaintiff's page numbering when referencing his second amended complaint.

[3] Plaintiff makes identical allegations in count XI regarding the catheter infection as he makes in count III. Based on that, defendants filed a separate motion for partial summary judgment as to count XI (#92). The court issued a separate report and recommendation dismissing count XI (#__). The court will address the catheter infection allegations in this report and recommendation within the context of count III, and will liberally construe plaintiff's complaint to include the factual allegations from both counts. The court will additionally consider the arguments the parties make in all pleadings addressing the merits of the infected catheter claim. *See* #92, #101, #116, and #118.

## II. DISCUSSION & ANALYSIS

**A. Discussion**

**1. Summary Judgment Standard**

Summary judgment allows courts to avoid unnecessary trials where no material factual disputes exist. *Northwest Motorcycle Ass'n v. U.S. Dept. of Agriculture*, 18 F.3d 1468, 1471 (9th Cir. 1994). The court grants summary judgment if no genuine issues of material fact remain in dispute and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In deciding whether to grant summary judgment, the court must view all evidence and any inferences arising from the evidence in the light most favorable to the nonmoving party. *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996). In inmate cases, the courts must

> [d]istinguish between evidence of disputed facts and disputed matters of professional judgment. In respect to the latter, our inferences must accord deference to the views of prison authorities. Unless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage.

*Beard v. Banks*, 126 S.Ct. 2572, 2576 (2006). Where reasonable minds could differ on the material facts at issue, summary judgment should not be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986).

The moving party bears the burden of informing the court of the basis for its motion, and submitting evidence which demonstrates the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the party opposing the motion may not rest upon mere allegations or denials in the pleadings but must set forth specific facts showing that there exists a genuine issue for trial. *Anderson*, 477 U.S. at 248. Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322-23.

**2. Deliberate Indifference Standard**

The Eighth Amendment prohibits the imposition of cruel and unusual punishment and

"embodies broad and idealistic concepts of dignity, civilized standards, humanity and decency." *Estelle v. Gamble*, 429 U.S. 97, 102 (1976) (citation and internal quotations omitted). A prison official violates the Eighth Amendment when he acts with "'deliberate indifference' to a substantial risk of serious harm to an inmate." *Farmer v. Brennan*, 511 U.S. 825, 828 (1994). To establish an Eighth Amendment violation, a plaintiff's case must satisfy an objective standard – that the deprivation was serious enough to amount to cruel and unusual punishment, and a subjective standard – deliberate indifference. *Id*. at 834.

The objective standard, a "serious medical need," is met if the failure to treat a prisoner's condition could result in further significant injury or the "unnecessary and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). The Ninth Circuit's examples of serious medical needs include "the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000) (citations omitted).

The subjective standard of deliberate indifference requires "'more than ordinary lack of due care for the prisoner's interests or safety.'" *Farmer*, 511 U.S. at 835 (*quoting Whitley v. Albers*, 475 U.S. 312, 319 (1986)). The requisite state of mind lies "somewhere between the poles of negligence at one end and purpose or knowledge at the other." *Id.* at 836. It is the equivalent of recklessly disregarding a substantial risk of serious harm to the inmate. *Id.* Mere negligence on the part of prison medical staff is not sufficient to prove deliberate indifference. *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988). "A defendant must purposefully ignore or fail to respond to a prisoner's pain or possible medical need in order for deliberate indifference to be established." *McGuckin v. Smith*, 974 F.2d 1050, 1060 (9th Cir. 1992), *overruled in part on other grounds in WMX Technologies, Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997).

**B. Analysis**

**1. Loss of Eyesight**

Plaintiff alleges that in November 2004, an eye doctor examined his right eye, determined

4

1  that he had "central retinal vein occlusion," and recommended that plaintiff see an eye specialist
2  (#67, p. 6). Plaintiff claims that in December 2004, he traveled to Reno to see the eye specialist,
3  who requested that plaintiff return in two weeks for further examination. *Id*. Plaintiff alleges that
4  defendant D'Amico and Does three and four on the Medical Review Board did not allow plaintiff
5  to return to the eye specialist. *Id*. Plaintiff further alleges that in May, June and July 2005, he
6  experienced worsening pain in his right eye and he informed the NNCC nurses. *Id*. at 6(a).
7  Sometime during the summer, the eye doctor re-examined plaintiff, determined there was high
8  pressure in his right eye, and gave him drops which helped to reduce the pressure. *Id*. Plaintiff
9  claims that on August 15, 2005, he had an appointment with the eye specialist in Reno. *Id*.
10 Plaintiff alleges that after a strip search, correctional officer defendant Bashor told plaintiff
11 "Garcia, you need to shut up or you'll have problems coming and going." *Id*. Plaintiff states that
12 he perceived this as a threat, and asked defendant Bashor what he meant. *Id*. Defendant Bashor
13 allegedly told plaintiff that he was unhappy about having to escort plaintiff to Reno "just to
14 babysit your dumb ass," to which plaintiff responded, "Then don't go." *Id*. Plaintiff alleges that
15 defendant Bashor began yelling that plaintiff refused to go to his eye appointment. *Id*. Plaintiff
16 was not transported that day. *Id*. Plaintiff alleges that a week later, he was transported to the
17 Reno eye specialist, where he was treated. *Id*. at 6(b). Plaintiff lost all sight in his right eye at
18 some time subsequent. *Id*. Plaintiff claims that defendants' actions contributed to the loss of his
19 eyesight. *Id*.

20      Plaintiff's medical records reveal that on November 29, 2004, Dr. Fischer with the Nevada
21 Eye Foundation saw plaintiff for complaints of decreased vision in his right eye (#90, D-MSJ
22 0061). Dr. Fischer determined that plaintiff had a "central retinal vein occlusion in the right eye."
23 *Id*. Although Dr. Fischer noted that plaintiff had a long history of diabetes that had been poorly
24 controlled, he stated that the decreased vision in plaintiff's right eye was due to the vein
25 occlusion, not his diabetes. *Id*. Dr. Fischer referred plaintiff to a Reno eye specialist. *Id*.

26      Plaintiff received approval and visited the Nevada Retina Associates on December 10,
27 2004. *Id*., D-MSJ 0062-0064. Dr. Hardeep Dhindsa confirmed Dr. Fischer's diagnosis of a
28 central retinal vein occlusion, and additionally found cystoid musculas edema in the right eye.

5

1   *Id.*, D-MSJ 0064. Dr. Dhindsa recommended that plaintiff "return for florescein angiography,"
2   and that plaintiff "maintain good control of glucose and blood pressure." *Id*. Dr. Dhindsa
3   concluded that the vein occlusion "is most likely related to [plaintiff's] microvascular disease,"
4   and stated he would have recommended aspirin if plaintiff had not been allergic to it. *Id*. Dr.
5   Dhindsa discussed with plaintiff the complications related to his condition, and stated, "with
6   respect to his mascular edema, if in several months he continues to maintain significant retinal
7   thickening, I brought up the possibility of intravitreal Kenelog injection." *Id*. The doctor
8   discussed the risks of such an injection with plaintiff, including "bleeding, infection, retinal tear,
9   retinal detachment, loss of vision, loss of the eye, worsening of cataract, and glaucoma." *Id*. Dr.
10  Dhindsa stated, in what appears to the court to be in reference to the mascular edema, "At this
11  point, I would prefer to see if the patient's condition resolves on its own." *Id*.

12  On July 1, 2005, plaintiff complained that it felt as though there was sand in his eye, and
13  that the bone around his eye hurt. *Id.*, D-MSJ 0065. On July 13, 2005, Dr. Gedney referred
14  plaintiff to Dr. Fischer for a florescein angiogram. *Id.*, D-MSJ 0066. The next day, plaintiff
15  again complained about the severe pain around his eye. *Id.*, D-MSJ 0068. Plaintiff also
16  complained of pain on July 18 and 25, 2005 (#122, Exhibit P15). On July 29, 2005, Dr. Fischer
17  examined plaintiff and found he had developed neovascular glaucoma in his right eye, which was
18  secondary to the vein occlusion, and that the pressure in that eye was 55mm (#90, D-MSJ 0070).
19  Dr. Fischer prescribed eye drops, and stated, "the patient should be scheduled as soon as possible
20  to see the retinal specialist ... . The end result of this problem can well be a blind, painful eye."
21  *Id*. The Medical Panel approved a specialist on August 2, 2005, and Dr. Gedney referred plaintiff
22  on August 11, 2005, noting that plaintiff needed immediate treatment and that there was a risk
23  of loss of vision. *Id.*, D-MSJ 0072-0075. Plaintiff's progress notes from August 11, 2005 noted
24  that Nevada Retinal Specialists had called and recommended laser treatment, which was approved
25  by defendant D'Amico (#122, Exhibit p5).

26  Plaintiff was scheduled for transport to the Reno eye specialist on August 15, 2005 (#89,
27  D-MSJ 0078-0082). Defendant Bashor was to accompany plaintiff on the transport. *Id.*, D-MSJ
28  0078. In an incident report, defendant Bashor stated that in preparation for the transfer, he held

6

1  plaintiff' sunglasses to his eyes to determine whether they were prescription sunglasses. *Id*.
2  According to defendant Bashor, plaintiff stated "I need those sunglasses because the f..king sun
3  hurts my eyes." *Id*. Defendant stated that plaintiff then interrupted defendant Bashor's question
4  regarding whether the sunglasses were prescribed, and told him, "I need my f..king glasses." *Id*.
5  Defendant Bashor stated he thought plaintiff was being unjustly rude and agitated, so he told
6  plaintiff, "Mr. Garcia, you need to stop with the attitude, I don't need it on a transport," to which
7  plaintiff replied, "F..k this I'm not going." *Id*. Defendant Bashor then had plaintiff sign a refusal
8  of medical treatment form. *Id*. Plaintiff proceeded to cross out many of the terms in the liability
9  release. *Id*., D-MSJ 0080. Defendant Bashor had plaintiff sign a second form. *Id*., D-MSJ 0081.
10 Plaintiff received a notice of charges for this incident. *Id*., D-MSJ 0082.

11 On August 17, 2005, Dr. Gedney wrote a second referral for plaintiff, stating that plaintiff
12 "claims he didn't really refuse to go, officer gave him such a hard time he signed refusal form"
13 (#122, Exhibit P8). On August 23, 2005, plaintiff underwent laser surgery. *Id*., Exhibit P6.

14 Plaintiff denies that he refused to go to the August 15, 2005 doctor's appointment in Reno
15 (#100, p. 3). He admits to crossing out terms and signing the first liability form, but claims that
16 he signed the second release under duress because defendant Bashor told plaintiff that if he
17 crossed anything out, plaintiff would be put "in the hole." *Id*. Plaintiff notes that the letters
18 "U/D" appear after his name, which he states stand for "under duress." *Id*. Plaintiff denies being
19 hostile, and reiterates the allegations in his complaint. *Id*. at p. 4. Finally, plaintiff argues that
20 had defendant Bashor allowed him to go to the specialist on August 15, 2005, his eyesight might
21 have been saved (#100, p.5). Defendants argue there is no evidence that defendant Bashor's
22 actions caused plaintiff's sight loss (#117).

23 Viewing the facts in the light most favorable to plaintiff, the court concludes that there
24 are genuine issues of material fact precluding summary judgment. First, there is no question that
25 losing sight in one eye constitutes a "serious" medical need. As to the subjective prong, plaintiff
26 claims that defendant Bashor purposely prevented him from attending his August 15, 2005
27 appointment. This is material only if defendant Bashor's actions could have caused plaintiff's
28 sight loss. The evidence reveals that as of August 15, 2005, it was imperative that plaintiff

7

receive immediate attention for his eye. Notably, on July 14, 2005, the consultant's notes stated "*Pt. needs to see ophthgst [sic] soon*" (#90, D-MSJ 0068). Dr. Fischer stated in his July 29, 2005 letter to Dr. Gedney that plaintiff could go blind if he was not scheduled to see the retina specialist "as soon as possible." *Id*., D-MSJ 0070. Dr. Gedney noted on August 11, 2005 that there was a risk of loss of vision if plaintiff did not receive "immediate" treatment. *Id*., D-MSJ 0072-0075. The priority for one of Dr. Gedney's referrals is marked "Emergency ASAP." *Id*., D-MSJ 0072. Another referral form states at the top "Get authorization ASAP ... pt. at specialist... I told them to save eye with laser." *Id*., D-MSJ 0074. The referrals are marked indicating that plaintiff's eye condition "significantly affected" the quality of his life because he could go blind. *Id*., D-MSJ 0066, 0072, 0074, and 0075. Based on the emergency situation and viewing plaintiff's allegations in the light most favorable to plaintiff, defendant Bashor's actions caused a delay in treatment. There was clearly a known risk in delaying plaintiff's treatment, namely, blindness. Thus, there is a genuine issue of material fact as to defendant Bashor's subjective intent.

Regarding plaintiff's claims against defendants D'Amico and the Medical Review Board, plaintiff submits evidence that Dr. Dhindsa ordered plaintiff to return for a florescein angiography (photos of plaintiff's eye) within two weeks of his December 10, 2004 appointment (#122, Exhibit P4(c), (stating "w/i 2 weeks")). Plaintiff alleges that defendant D'Amico and the Medical Review Board did not allow plaintiff to return for the exam (#67). Although it is clear that plaintiff did not make a second trip in December 2004, there is no evidence to demonstrate *why* the trip did not occur.[4] Aside from the fact that plaintiff did not go for the florescein angiography, plaintiff submits no evidence – such as a medical kite or grievance – that defendants *denied* him

---

[4] Defendants argue that Dr. Dhindsa's preference was to wait and see whether plaintiff's condition resolved itself (#117). However, the court's review of Dr. Dhindsa's letter indicates that his wait and see preference refers to plaintiff's macular edema, not the vein occlusion. There is no evidence as to whether the edema or the vein occlusion (or both) caused plaintiff's sight loss, so the court is unable to determine whether the failure to return in December 2004 led to his blindness. It does seem that if there were a wait and see recommendation for both conditions, as defendants argue, Dr. Dhindsa would not have wanted to see plaintiff back in two weeks for a florescein angiography. Nonetheless, there is no evidence to demonstrate that defendant D'Amico *prevented* plaintiff from returning to Dr. Dhindsa. The court speculates that the failure to return was likely an oversight, or a misinterpretation of Dr. Dhindsa's instructions.

1 this trip.

2   Count III against defendant D'Amico and the Medical Review Board is dismissed.
3 However, based on the genuine issues of material fact, the court denies defendants' motion for
4 summary judgment as against defendant Bashor.

5   **2. The Infected Catheter**

6   Plaintiff second claim in count III is that defendants Williams and Jacobs acted with
7 deliberate indifference to a painful, life-threatening infection which caused plaintiff to be
8 hospitalized twice (#67, pp. 6(b)-6(d) and 14-14(b)).[5] In April 2005, plaintiff went into renal
9 failure and had to begin dialysis. *Id*. at pp. 6(b) and 14. Plaintiff alleges that soon after he began
10 dialysis, defendant Williams "popped the vein," and he had to be transported to Carson Tahoe
11 Hospital ("CTH") for insertion of a catheter. *Id*. Sometime after the catheter was inserted,
12 plaintiff reported that after dialysis, he felt cold, shook "violently," and vomited. *Id*. at p. 6(c) and
13 14. Plaintiff alleges that defendant Williams told him that the symptoms were not related to his
14 dialysis, and to see "medical." *Id*. Plaintiff claims that defendant Jacobs told him "no fever, no
15 problem Albert." *Id*. at p. 14(a). Plaintiff alleges that on August 22, 2005, he finally refused
16 further dialysis based on these symptoms, and the doctor ordered a blood test. *Id*. at p. 6(c) and
17 14(a). The blood test revealed that plaintiff had an infection from the catheter, and plaintiff
18 claims he was hospitalized at CTH for four days, and his catheter was replaced. *Id*. Plaintiff
19 further alleges that a month later, he began to experience the same symptoms after dialysis and
20 noticed some blood near his catheter. *Id*. Plaintiff claims he mentioned the blood to defendant
21 Williams three times, and she told plaintiff "that's nothing." *Id*. Thereafter, a substitute nurse
22 reported the blood to the doctor, and a second blood test detected a second infection. *Id*.
23 Plaintiff's catheter was subsequently removed. *Id*. at 14(b).

24   Plaintiff's medical records reveal that he first complained of symptoms on August 15,
25 2005 (#122, Exhibit P16). Defendant Williams noted that plaintiff told her he had experienced

---

28 [5] As noted above, the court will treat this *pro se* prisoner' complaint liberally, and address all of the allegations surrounding his infected catheter, whether contained in count III or XI.

1  chills, vomiting and weakness after his prior dialysis, and she instructed plaintiff to return to the
2  medical facility if the symptoms recurred. *Id*. On August 17 and again on August 19, defendant
3  Williams's notations include that plaintiff complained of the same symptoms after his transfers.
4  *Id*. The August 17 notation states that Dr. Gedney was aware of the situation. *Id*. Dr. Gedney's
5  August 17 notes state that plaintiff complained that three different days he had "shaking chills"
6  post-dialysis, but no chills in between dialysis. *Id*., Exhibit P5. During the exam, plaintiff had
7  no cough, nausea, vomiting, diarrhea, or fever and his physical was "normal," but he did have a
8  mild headache. *Id*. Dr. Gedney noted that the "etiology of chills" was "unknown." *Id*.

9  On August 22, defendant Williams noted that plaintiff reported having chills, nausea and
10  weakness all weekend starting right after dialysis. *Id*., Exhibit P15. Defendant Williams reported
11  this information to Dr. Gedney. *Id*. Further, after noting a moderate amount of white drainage
12  around the "DLC exit site," she took a culture. *Id*. Defendant Williams states that she informed
13  "Dr. John," and started plaintiff on antibiotics. *Id*. On August 23, Dr. Gedney's notes state that
14  plaintiff was sent to CTH for a probable "perma cath infection" after experiencing shaking chills
15  and a significant increase in his white blood count. *Id*., Exhibit P6.

16  Plaintiff returned on August 27 with a new catheter in his left chest. *Id*., Exhibit P15. He
17  was given antibiotics. *Id*. On August 31, plaintiff again complained of chills and a headache, so
18  defendant Williams called the doctor, who ordered medication. *Id*. On September 1, plaintiff
19  complained of chilling approximately one and a half hours into his dialysis transfer. *Id*.
20  Defendant Williams noted no drainage from the exit site except for a moderate amount of dried
21  blood, which she cleaned and re-dressed. *Id*. When the doctor called, defendant Williams
22  apprised her of plaintiff's complaint. *Id*. The doctor ordered more medication and plaintiff was
23  placed on the list to see her the next day. *Id*.

24  On October 1, 2005, a substitute nurse from "Chardonnay Dialysis" discovered a "small
25  pin hole" in plaintiff's catheter line, and noted that plaintiff told her that the leak had been there
26  for several transfers. *Id*., Exhibit P7. An October 3, 2005 entry states, "Please have Dr. Murphy
27  read notes from Chardonnay Dialysis nurse 10/1/05." *Id*., Exhibit P13. Another entry that same
28  day stated, "Have pt. come in at 7AM tomorrow to remove catheter." *Id*. Both entries have the

1    notation "done" after them. *Id*. Defendant Williams's notes from October 3 acknowledge that
2    a small hole had been found in plaintiff's catheter, and noted that the doctor was aware and that
3    the catheter would be removed the next day. *Id*., Exhibit P15.

4        The above evidence reveals that defendant Williams did not act with deliberate
5    indifference to plaintiff's serious medical needs. First, an infection that requires hospitalization
6    is clearly "serious." *Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000). Concerning the
7    subjective prong, the evidence indicates that defendant Williams informed Dr. Gedney of
8    plaintiff's symptoms only two days after plaintiff first made his complaints (#122, Exhibits P5
9    and P16). Dr. Gedney examined plaintiff on August 17, and noted that the etiology of plaintiff's
10   symptoms was unknown. *Id.*, Exhibit P5. Plaintiff complained of the same symptoms on August
11   19 and 22, after which defendant Williams again notified Dr. Gedney. *Id*., Exhibit P15. While
12   an argument could be made that defendant Williams should have informed the doctor on August
13   19 of the recurring symptoms, there is no indication or evidence to support plaintiff's claim that
14   defendant Williams deliberately ignored them. The court agrees with defendants that at the most,
15   defendant Williams mis-diagnosed the seriousness of plaintiff's infection. Even if plaintiff's
16   allegation that defendant Williams did not contact the doctor until plaintiff "quit" dialysis is true,
17   there is still no evidence that defendant Williams acted with anything more than negligence. This
18   is not a constitutional violation. *See Hutchinson*, 838 F.2d at 394 (mere negligence on the part
19   of prison medical staff is not sufficient to prove deliberate indifference). Defendant Williams
20   could not have "purposefully" ignored a serious risk if she did not think the risk was serious. *See*
21   *McGuckin*, 974 F.2d at 1060 (to establish deliberate indifference, a defendant must "purposefully"
22   ignore or purposefully fail to respond to a prisoner's pain or possible medical need).

23       After his trip to the hospital for treatment and to receive a new catheter, plaintiff again
24   complained of symptoms on August 31 and September 1 (#122, Exhibit P15). Both times
25   defendant Williams informed the doctor. *Id*. Again, there is no indication that defendant
26   Williams intentionally disregarded plaintiff's complaints.

27       Further, while the evidence reveals that the substitute nurse, and not defendant Williams,
28   discovered the pin hole in plaintiff's catheter, *see id*., Exhibit P7, this is not an indication that

11

1  defendant Williams acted with deliberate indifference. Even taking as true plaintiff's assertion
2  that defendant Williams did not treat the spot of blood on plaintiff's chest seriously, this would
3  again, at the most, point only to negligence because there is no indication that defendant Williams
4  thought the risk was serious and ignored it. There is an absolute absence of evidence that
5  defendant Williams intentionally ignored plaintiff's conditions.
6      Plaintiff claims that defendant Williams's failure to change her gown, wash her hands or
7  wear a face shield caused plaintiff's infections (#102). Defendants counter that CTH inserted the
8  catheter, and so defendants Williams could not have caused the infection (#89, #92, #117).
9  Again, even if it is true that defendant Williams failed to adhere to the proper standard of care as
10  to cleanliness, this constitutes negligence, not deliberate indifference. There is no evidence to
11  demonstrate that defendant Williams failed to adhere to such standards in order to make plaintiff
12  sick and then to ignore his symptoms.
13      Finally, the court concludes that there is no evidence regarding defendant Jacobs's role
14  in the catheter infection. Plaintiff's assertion that defendant Jacobs told him "No fever, no
15  problem Albert," is simply not enough to prove a genuine issue of material fact for trial.

### III. CONCLUSION

Based on the foregoing and for good cause appearing, the court concludes as follows:

1. There are genuine issues of fact as to whether defendant Bashor prevented plaintiff from receiving treatment for his eye condition and whether this caused plaintiff's sight loss in his right eye;

2. There is no evidence to support plaintiff's allegation that defendant D'Amico and the Medical Review Board prevented plaintiff from returning to the eye specialist for further evaluation in December 2004;

3. There is no evidence to support plaintiff's allegations that defendant Williams acted with deliberate indifference to plaintiff's complaints of pain caused by his infected catheter; at the most, defendant Williams was negligent, which is not a violation of plaintiff's Eighth Amendment rights; and

4. There is an absence of any evidence against defendant Jacobs.

As such, the court recommends defendants' motion for partial summary judgment (#89) be **DENIED** as to defendant Bashor with regard to plaintiff's count III claim concerning the loss of his eyesight, and **GRANTED** as to defendants D'Amico, the Medical Review Board,

Williams, and Jacobs with respect to count III.

The parties are advised:

1. Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule IB 3-2 of the Local Rules of Practice, the parties may file specific written objections to this report and recommendation within ten days of receipt. These objections should be entitled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the District Court.

2. This report and recommendation is not an appealable order and any notice of appeal pursuant to Fed. R. App. P. 4(a)(1) should not be filed until entry of the District Court's judgment.

## IV. RECOMMENDATION

**IT IS THEREFORE RECOMMENDED** that defendants' motion for partial summary judgment (#89) be **DENIED** as to defendant Bashor with regard to plaintiff's count III claim concerning the loss of his eyesight, and **GRANTED** as to defendants D'Amico, the Medical Review Board, Williams, and Jacobs with respect to count III.

**DATED:** February 6, 2008.

*Valerie P. Cooke*

_____
**UNITED STATES MAGISTRATE JUDGE**